### DUKE v. ST. LOUIS & S. F. R. CO.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. July 20, 1909.)

1. COURTS (§ 353*)—FEDERAL COURTS—STATE PRACTICE—NEW TRIAL.
   On motions for new trial, federal courts act independent of any state statute or practice.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. § 933; Dec. Dig. § 353.*
   Following state practice, see notes to O'Connell v. Reed, 5 C. C. A. 605; Nederland Life Ins. Co. v. Hall, 27 C. C. A. 393.]

2. NEW TRIAL (§ 6*)—DISCRETION.
   A motion for a new trial is addressed to the legal or judicial discretion of the trial court.
   [Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 9, 10; Dec. Dig. § 6.*]

3. NEW TRIAL (§ 27*)—FEDERAL COURTS—DISCRETION.
   The court will not grant a new trial unless it is reasonably clear that prejudicial error has crept into the record when it appears that the verdict is for the right party.
   [Ed. Note.—For other cases, see New Trial, Cent. Dig. § 40; Dec. Dig. § 27.*]

4. APPEAL AND ERROR (§ 1004*)—REVIEW—EXCESSIVENESS OF VERDICT.
   An objection that the verdict is excessive is available only on a motion for a new trial in the trial court, and cannot be considered on writ of error.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3944–3947; Dec. Dig. § 1004.*]

5. DAMAGES (§ 228*)—NEW TRIAL (§ 162*)—CONDITIONS OF DENIAL—EXCESSIVE DAMAGES—REMITTITUR.
   A federal court cannot arbitrarily order a remittitur from an excessive verdict, and can only give plaintiff an election to file a remittitur as a condition to the court denying a new trial.
   [Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 576–579; Dec. Dig. § 228;* New Trial, Cent. Dig. § 324; Dec. Dig. § 162.*]

6. DEATH (§ 99*)—EXCESSIVE DAMAGES.
   Deceased at the time of his death was 29 years old, with a life expectancy, if he had been in normal health, of 36 years. He was married

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in 1900 at the age of 20, and during the succeeding nine years, while apparently industrious, had spent several thousand dollars of his wife's estate and all he had made himself, leaving at his death only $250. Before marriage he taught school, and after marriage did hauling, stacked lumber in a sawmill, worked on a farm a year, and then began braking on defendant's railroad, having contributed to his family, consisting of wife and five children, an average of about $34 a month. During his marriage he had suffered from a bronchial cough, for which he had been confined in a hospital, where it was discovered that one of his lungs was dead, and a physician testified that this condition would greatly shorten his life. *Held*, that a verdict for $17,545 was excessive, and should be reduced to $6,000.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

**7. DEATH (§ 86*)—EMPLOYER'S LIABILITY ACT—DAMAGES—LOSS TO CHILDREN.**

In an action for the death of a railroad brakeman under the employer's liability act (Act April 22, 1908, c. 149, 35 Stat. 65), providing that the recovery shall inure to the benefit of deceased's family, an instruction permitting a recovery for the loss sustained by decedent's children, consisting of their loss of care, attention, instruction, and training, from their father's death, was not erroneous.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 112–114, 119; Dec Dig. § 86.*]

**8. DEATH (§ 95*)—AMOUNT OF RECOVERY.**

In an action for wrongful death, the amount of recovery depends on the age, character, earning capacity, habits, and morals of the deceased, and of his care, attention, and solicitude for his children.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108, 109, 111–115, 120; Dec. Dig. § 95.*]

**9. TRIAL (§ 125*)—ARGUMENT OF ATTORNEY—MISCONDUCT—DUTY OF COURT TO CORRECT.**

Where, in an action for wrongful death, it appeared that decedent left a wife and two children of tender years, it was improper for plaintiff's counsel in argument to draw a picture of an imaginary wayward son or daughter at the critical period when prone to go astray unless controlled by a father's care, and from this draw the inference that no amount of money could compensate for such things, and make it the basis of a verdict, and the court of its own motion should have stopped counsel, and admonished the jury to disregard such argument.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 303–307; Dec. Dig. § 125.*]

Action by Mrs. Clyde Duke, administratrix, etc., against the St. Louis & San Francisco Railroad Company to recover damages for the death of her husband. Plaintiff had judgment for $17,545, and defendant moved for a new trial. Motion granted unless plaintiff file a remittitur of her recovery above $6,000.

O. L. Miles, for plaintiff.

B. R. Davidson, for defendant.

ROGERS, District Judge. This is a motion for a new trial. I shall notice only two grounds of the motion, to the effect that the verdict was not warranted by the evidence, was excessive, and appeared to have been given under prejudice and passion. It is necessary to refer to the practice in the federal courts in relation to motions for new trial before addressing myself to that question.

In Fishburn v. Chicago, Milwaukee & St. Paul Ry., 137 U. S. 61, 62, 11 Sup. Ct. 8, 34 L. Ed. 585, Chief Justice Fuller said:

"In regard to motions for new trial and bills of exceptions, courts of the United States are independent of any statute or practice prevailing in the courts of the state in which trial is had." Mo. Pac. Ry. Co. v. Chicago & Alton Ry. Co., 132 U. S. 191, 10 Sup. Ct. 65, 33 L. Ed. 309.

This seems to be as well settled as any principle of law can be. Indianapolis Railroad Company v. Horst, 93 U. S. 291, 23 L. Ed. 898; In re Chateaugay Iron Co., 128 U. S. 544, 9 Sup. Ct. 150, 32 L. Ed. 508; Vanstone v. Stillwell & Bierce Mfg. Co., 142 U. S. 128, 12 Sup. Ct. 181, 35 L. Ed. 961. See cases cited in paragraph 1339, p. 2283, volume 2, Digest United States Supreme Court Reports by L. C. P. Co. In Indianapolis R. Co. v. Horst, 93 U. S. 301, 23 L. Ed. 898, Mr. Justice Swayne, in discussing an assignment of error that "the motion for a new trial should have been granted in the court below," said:

"In the courts of the United States such motions are addressed to their discretion. The decision, whatever it may be, cannot be reviewed here. This is a rule of law established by this court, and not a mere matter of proceeding or practice in the Circuit or District Courts. Henderson v. Moore, 5 Cranch, 11, 3 L. Ed. 22; Doswell v. De La Lanza, 20 How. 29, 15 L. Ed. 824; Schuchardt v. Allen, 1 Wall. 371, 17 L. Ed. 642. It is therefore not within the act of Congress of June 1, 1872, and cannot be affected by any state law upon the subject. Judgment affirmed."

Of course, the discretion referred to is a legal, a judicial, and not an arbitrary, discretion. See cases cited on page 2284 of the Digest last cited. See, also, Felton v. Spiro, 78 Fed. 576, 24 C. C. A. 321, decided by the Sixth Circuit Court of Appeals, opinion by Taft, Judge. This motion for a new trial is therefore addressed to the sound discretion of the court. Naturally all courts are reluctant to grant motions for new trial, and for divers reasons will not grant them unless it is reasonably clear that prejudicial error has crept into the record, and they are always reluctant to do so when the court is convinced that the verdict is in favor of the right party. I felt at the conclusion of this trial that the plaintiff was entitled to recover. I am clear now on the record as then made that she was entitled to a verdict. Every effort was made by the court to shut out incompetent evidence, and I do not believe any vital error was committed against the defendant in that regard. The sole question, therefore, to discuss is whether the verdict was excessive. The serious importance of this question to the defendant appears when it is known that, if error has been committed by the jury, it can be corrected in no other way than by the trial court on a motion for new trial. In Railroad Co. v. Winter, Administrator, 143 U. S. 60, 12 Sup. Ct. 356, 36 L. Ed. 71, the Supreme Court of the United States said:

"Whether the verdict was excessive it is not our province to determine on this writ of error. The correction of that error, if there were any, lay with the court below upon a motion for a new trial, the granting or refusal of which is not assignable for error here. As stated by us in Ætna Life Ins. Co. v. Ward, 140 U. S 76, 11 Sup. Ct. 720, 35 L. Ed. 371: 'It may be that, if we were to usurp the functions of the jury and determine the weight to be given to the evidence, we might arrive at a different conclusion. But that

is not our province on a writ of error. In such a case we are confined to the consideration of exceptions, taken at the trial, to the admission or rejection of evidence and to the charge of the court and its refusals to charge. We have no concern with questions of fact or the weight to be given to the evidence which was properly admitted.'" Southern Pac. Co. v. Cavin, 144 Fed. 348, 75 C. C. A. 350.

Nor can the trial court arbitrarily order a remittitur for reasons which will clearly appear by reading Kennon v. Gilmer, 131 U. S. 22, 9 Sup. Ct. 696, 33 L. Ed. 110. If a remittitur is entered, it must be at the election of the plaintiff. It may, however, be at the suggestion of the court that, if not done, a new trial will be granted. Some courts hold that in personal injury cases where the damages are excessive the new trial should always be granted.

We now come to consider the verdict. The sum assessed by the jury in this case was $17,545. This sum, if invested at 10 per cent., which is what money was shown to be worth in the neighborhood where plaintiff resides, would yield $1,754.50 per annum. If invested at 8 per cent., it would yield $1,403.60. If invested at 6 per cent., it would yield $1,052.70. If invested at 4 per cent., it would yield $701.80, and, in either event, at the end of the full life expectancy of the deceased— i. e., 36 years—the principal remain untouched. Let us examine the proof. The deceased was 29 years of age. His life expectancy was about 36 years. He was married in 1900, at about the age of 20, and killed in a derailment while a brakeman on one of defendant's trains on the 28th of March, 1909. In the nine years of his married life (which embraced all of his adult years), while apparently industrious, he had spent several thousand dollars of his wife's estate, and all he had made himself, and his estate at his death amounted to about $250. Before his marriage he had taught a country school, and had nothing when he married. After his marriage he had driven a team used in hauling (presumably his own). For a time he had stacked lumber at a sawmill, had farmed one year, and then began braking on a railroad. What his earnings were prior to going into the service of the defendant company, 33 months before his death, are not shown. During the 33 months of his service as brakeman in defendant's service his total gross earnings were $2,139.92; the average monthly gross earnings $64.84. After deducting certain sums held by the defendant company to pay for meals, hospital expenses, dues, etc., upon his order, the actual amount he drew from the company in cash was $1,740.42, or a monthly average of $52.71. This estimate does not cover the earnings during the month he was killed, which amounted to $76.26, covering 26 days' service in that month. Out of the $1,740.42 actually drawn should be deducted at least for his actual personal expenses, such as clothing, food when not on the road, doctor's bills, medicines, and other incidental expenses. If one-third of the $1,740 be treated as going to his personal expenses, then he could not have appropriated in excess of $1,111.28 to his family during the 33 months next prior to his death, or an average of about $34 a month, or $408 per annum. Three per cent. on the verdict would yield an annuity of $526.35, and leave at the end of the life expectancy the entire amount of the verdict untouched. But it is said that, in addition to such sums as the evi-

dence shows plaintiff appropriated to the support of his family, his children are entitled to recover for the loss of care, attention, instruction, and training resulting from the father's death, and the jury were so instructed. That seems to be the settled law in some of the states, including Arkansas. But I am driven to confess, upon a re-examination of this case, that I am unable to find any federal case which recognizes the doctrine to that extent, and it may be that the instruction is erroneous. I have, however, found two cases in the federal courts bearing upon the subject. In Spiro v. Felton (C. C.) 73 Fed. 91, Clark, District Judge, held under a statute of Tennessee for an injury causing death, the recovery under the Tennessee statute being for the benefit of the widow and next of kin of the deceased, evidence of the number and ages of the children of the deceased is competent; and in Baltimore & Potomac R. Co. v. Mackey, 157 U. S. 72, 15 Sup. Ct. 491, 39 L. Ed. 624, under an act of Congress passed February 17, 1885 (chapter 126, 23 Stat. 307), under an act similar to the Lord Campbell act, it was held that:

"It is not error to charge a jury that in estimating damages they may take into consideration the age of the deceased, his health and his strength, his capacity to earn money as disclosed by the evidence, his family and who they are and what they consist of, and from all the facts and all the circumstances make up their minds how much the family would probably lose by his death."

And in that case the court say:

"The injury shown to a family, consisting of a widow and helpless young children, who depended for support entirely upon the labor of her husband and father, whose death was caused by the wrongful act of others, is much greater than would be done to any next of kin able to maintain themselves and who have never depended, and had no right to depend, upon the labor or exertions of the deceased for their maintenance."

An examination of the statute under which that decision is made will disclose that, though it is couched in different language, the substance is practically the same as the employer's liability act (Act April 22, 1908, c. 149, 35 Stat. 65) under which the case at bar was brought, and it is expressly provided in that statute that the recovery shall inure to the benefit of the family of the deceased. This case so nearly supports the instruction to which I have referred that I should not feel inclined to disturb a verdict based upon the assumption that the instruction given by the court in this case was error. It is but a single step—it seems to me now a logical step—from the instruction given by the court to the principles recognized in the cases to which I have referred. It may be that upon an exhaustive examination I may find that the federal court does not go as far as the instruction went, and in that event, of course, this court will follow the federal authorities.

But, to revert to the question of the right of recovery on account of the loss to the children of the care, attention, instruction, and training by reason of their father's death, in the case of the St. Louis & N. A. R. Co. v. Mathis, 76 Ark. 185, 91 S. W. 763, 113 Am. St. Rep. 85, that very question was before the court. The recovery in that case was $10,000. In that case McCulloch, J., said this:

"The testimony fairly establishes the fact that the deceased contributed to the support of his family as much as $350 per annum in addition to his earn-

ings in supervision of his farm, and that the present value of his annuity in that sum for his expectancy would be $4,690. He owned a small farm of 80 acres of land, and was out of debt. It is also shown by undisputed testimony that he was a very industrious man, of good moral character, and was especially solicitous as to the mental and moral training of his children; that he was a kind and indulgent father, provided well for his family, and gave much attention to the proper instruction and education of his children. He had five children, the youngest of them being only two years of age at the time of the accident. This is a well-recognized element of damages in suits of this kind for the benefit of minor children, and it is held to be for the jury to say from all the facts and circumstances found what will be a fair compensation to the children for the pecuniary loss of the care and attention of the father in the way of training and instruction. Railway Co. v. Sweet, 60 Ark. 559, 31 S. W. 571; Railway Co. v. Maddry, 57 Ark. 306, 21 S. W. 472."

The judgment in this case was affirmed, and on motion for a rehearing the matter came up for consideration again, and section 6217, Kirby's Dig. (cited by plaintiff's counsel), in relation to motions for new trial, was held unconstitutional, and, after a careful reconsideration of the evidence, Judge McCulloch said:

"We said in the former opinion that the evidence warranted a verdict for $4,690 damages to cover the probable contributions of the deceased to the support of his family. This is certainly the utmost limit to which the jury should have gone upon this element of damages. If we indulge in the presumption that the jury confined the verdict to the limits warranted by the evidence as to this element, it leaves the sum of $5,310, which must have been assessed to cover damages for the loss of the care, attention, and moral training of the father to his children."

Encountering and discussing at some length the question of fixing any proper sum as compensatory for the loss of the care, attention, and moral training of the father to his children, and recognizing that the sum is indeterminate and can be ascertained by no fixed rule, or measurement, but must be left to the sound discretion of the jury, the court nevertheless concludes that there must be some limit to the amount allowed on this account, and it is the plain duty of the appellate court to see that such limits are not exceeded, and, after its full consideration, required the plaintiff to enter a remittitur of $2,000, leaving the judgment to stand for $8,000.

It cannot be fairly said in the light of the testimony in this case that the deceased measures up to a higher standard than that laid down by the court in the Mathis Case. Mathis had acquired a home. He was out of debt; he was industrious and of good moral character; he was especially solicitous as to the mental and moral training of his children; he was a kind, indulgent father; he provided well for his family, and gave attention to the proper instruction and education of his children, of whom there were five, the youngest being two years of age. In the case at bar the deceased had acquired no home; he was industrious, sober, and of good moral character; he seemed to be interested in the education of one of his children, the other being too small. There is nothing to show that he was not kind and indulgent; but, after all has been said, the inevitable conclusion follows from the facts already stated that he was unsuccessful in his business affairs. Instead of having accumulated, he had, to a large extent, dissipated the inheritance of his wife.

In Railway Co. v. Maddry, 57 Ark. 307, 21 S. W. 472, it appears

172 F.—44·

that Maddry was 52 years of age, and drew a pension of $72 a month, which it was reasonable to suppose he would continue to draw during the full period of his life. He had been a postmaster, a school director, a promoter of schools, and there was evidence tending to show that he was industrious in his habits and entitled to the respect of those who knew him, and that he was an affectionate and dutiful father, who tried to rear and educate his children properly. The verdict in that case was $7,500, and the case was affirmed, but Judge Hemingway, who delivered the opinion of the court said, in reference to the amount of the verdict:

"This is certainly a border case, and we are convinced that the jury went very near the limit upon its power. It may be that this case illustrates the evil to be apprehended in administering the law; but, if this is true, it is inherent in the law, and can be remedied only by the power that made the law. We have given to the consideration of this case much time and the most careful deliberation, seriously apprehending that it exacted too much of the defendant, but our conclusion is that there is no error for which we can reverse the judgment."

In the Mathis Case referred to the Supreme Court abandoned the position that it could not remedy an excessive verdict. No one can read these two cases without recognizing the fact that the verdict must bear a just and proper relation to the testimony. The amount to be recovered is made to depend upon the age, the character, the earning capacity, the habits and morals of the deceased, and of his care, and attention and solicitude for his children; so that the jury in passing upon questions of this kind cannot proceed arbitrarily, but their verdict must have a proper relation to the facts developed in the trial. Even where recovery is sought for bodily suffering and mental pain, Judge Sanborn held in Southern Pacific R. Co. v. Hetzer, 135 Fed. 274, 68 C. C. A. 28 (1 L. R. A. [N. S.] 288), that:

"In actions for personal injury the plaintiff may recover for the bodily suffering and the mental pain which are inseparable and which necessarily and inevitably result from the injury."

The opinion distinctly denies any recovery for damages growing out of mortification or distress of mind from the contemplation of the crippled condition and its effect upon the esteem of his fellows, and adds that:

"Mental pain which is inseparable from the physical suffering caused by the injury is too remote, indefinite, and intangible to constitute an element of the damage in such a case, and evidence of it is inadmissible." Chicago, R. I. & P. R. Co. v. Caulfield, 63 Fed. 396, 11 C. C. A. 552; McDermott v. Severe, 202 U. S. 601, 26 Sup. Ct. 709, 50 L. Ed. 1162; Kennon v. Gilmer, 131 U. S. 22, 9 Sup. Ct. 696, 33 L. Ed. 110.

And in the matter of the recovery for future pain and suffering only such damages can be recovered as are reasonably certain to result from the injury, and not such as are merely probable or likely. Chicago, M. & St. P. R. Co. v. Newsome, 154 Fed. 665; 83 C. C. A. 422. Such damages could be recovered in no case unless the proof in the case justified the finding of the existence of the facts from which such damages may be reasonably inferred. But it was argued, first to the jury, and afterward to the court on this motion, that the jury had a

right to consider what it was said is generally known, that many young men accumulate nothing in early life; that they stumble and fall and get up and try again, showing courage and determination to do, and in after life succeed and accumulate. This is undoubtedly true of a certain percentage of men generally, and it is untrue of a certain percentage of men generally. If the jury in the exercise of their experience might consider this fact without evidence, then the matter becomes one of pure speculation, and the speculation must inevitably be as to which one of the two classes the deceased belonged. If they should judge his future by his past, they would be compelled to say that it gave but little promise of his ever appropriating a great deal more to his family than he was appropriating at the time of his death. If they should judge his future without reference to his past, and determine that in the future he would succeed, they must do that without any testimony at all, and would at once find themselves in the realm of conjecture and speculation. Such matters are wholly speculative and entirely too remote.

But there is another element in this case which is not found in the Mathis Case or in the Maddry Case. It is that element which relates to the physical condition of the deceased, and directly affects the question of his life expectancy. Counsel for the plaintiff seemed to treat this aspect of the case lightly. It impressed the court very differently. From the proof it appears that he had been troubled with a bronchial cough during his married life; that for some months before his death it had become worse; that in December, before his death in March, he had felt called to consult a physician with reference to his condition. It appeared that he was suffering with a dry, hacking cough, from night sweats, from a slow fever in the evening; and that after frequent visits to this physician he was advised to go to the hospital provided by the employés of the defendant railway company for their own use at St. Louis. There he underwent a careful and a critical examination by the physician in charge of that hospital, and it was found that one side of his chest was retracted; that his lung was dead; that no air seemed to penetrate it, and that one lung was performing all the service; that he came from a family three brothers of which had died early from malarial hæmaturia; that his wind was short; that he was at times dizzy from vertigo. This testimony was entirely undisputed. If it were not true, it cannot be that his widow was not advised of it. His immediate friends must have had more or less knowledge of it. But the plaintiff offered no evidence to combat it; and, when this condition of things was submitted to Dr. King, a reputable physician, as an expert, and inquiry made as to his physical condition, he said that he would consider it very much impaired, and that it would shorten his life very much, that the lung would never be restored, and that the disease would likely be progressive, and likely to culminate in tuberculosis, and that the fever from which he suffered was malarial or tubercular, and that he would regard his condition as grave. The case, as considered up to this time, is upon the theory that he was a sound man, and that there is no substantial reason why he might not live out his life expectancy; but the conditions just

stated cannot be overlooked. They are of the most serious character, and, if the information was in the possession of his widow or those familiar with his previous history, and no explanation was offered, it must be assumed that, if it had been offered, it would not have been favorable to the deceased. Counsel insisted that this character of testimony should have been produced by the defendant; but the court thinks the rule and the reason of the rule is the other way. The defendant was not in possession of the private history of the deceased, except as disclosed by himself or of his physical condition prior to his death further than it was developed by the testimony already referred to. But, as stated, the widow must have been, for they were living together, and had been for nine years, and whatever his physical condition was she must have known much of it. So his family physician and friends must have, to some greater or less extent, been familiar with the condition of his health. In Vicksburg & Meridian R. Co. v. Putnam, 118 U. S. 556, 7 Sup. Ct. 3 (30 L. Ed. 257), the Supreme Court of the United States said:

"Life and annuity tables are formed upon the basis of the average duration of the lives of a great number of persons. But what the jury had in this case to consider was the probable duration of this plaintiff's life and of the injury to his capacity to earn his livelihood."

So, in the case at bar, one of the questions for the jury to determine was whether or not the deceased would live out the term of his life expectancy. If he would not, then no recovery could be had for any loss that might flow from his death to his widow and children beyond the life period of the deceased. It is said the jury passed upon this question. If they did, they passed upon it with no other evidence than that offered by the defendant of his physical condition. There was no controversy about his condition. It may be that one suffering as plaintiff was shown to have been suffering could continue in the service in which he was engaged, and possibly be better for it at milder seasons of the year, and yet suffer and suffer seriously, as the proof shows he was suffering, during the winter months preceding his death. It was for the jury to consider in the light of this testimony what the probable duration of his life was, and that must be based not upon speculation, but upon the testimony in the case. In Louisville, E. & St. Louis Railroad Company v. Clarke, 152 U. S. 242, 14 Sup. Ct. 582 (38 L. Ed. 422) the court said:

"The age of the deceased, his probable expectancy of life, his occupation, his ability to labor, his accustomed earnings were all proper elements of inquiry as to the compensation proper to be awarded on account of his death."

In the case at bar Duke's probable expectancy of life was perhaps the most material factor, so far as the amount of recovery was concerned. If his earnings, however large, were only to continue for a few years or perhaps less, they could not be the basis for any considerable damages for the loss of life.

I think I ought to say in this case that I am of the opinion that the jury were misled by the earnestness and zeal and pathetic appeal made to them by plaintiff's counsel in the closing argument. One argument made in the closing of the case I regard as unfair, unwarranted by any

evidence in the case, purely speculative, outside of the record, and well calculated to bring about exactly the result which occurred, an excessive verdict. It was not objected to by defendant's counsel, but the court thinks now he was himself at fault in not on his own motion stopping counsel and admonishing the jury to disregard it. Union Pac. R. R. Co. v. Field, 137 Fed. 14, 69 C. C. A. 536. It was, however, unexpected, without precedent in the experience of the court in such cases, and for the moment did not impress the court as it has since and upon reflection and closer examination of the authorities. The conclusion arrived at is that all damages must have some substantial basis in the evidence, which was wholly wanting in the record of this case in the respect mentioned. To draw a picture of an imaginary wayward son or daughter at that critical period when they are prone to go astray, saved by the timely interference of a strong and tender and watchful father, and from this imaginary incident draw the inference that no money could compensate for such things, and make that the basis of a verdict in damages in a case where there could be no such evidence, since the only children of deceased were of very tender years, and what might occur when they had reached the period in life when such a spectacle as was pictured could occur, is obviously going beyond the realm of legitimate discussion upon the evidence adduced, and indulging in speculation as to conditions which may never occur as the basis for the recovery of damages. The law recognizes no such rule. Such damages are too remote, indefinite, uncertain, and visionary. The zeal of counsel led him beyond the realm of legitimate discussion, and the court was derelict in not instantly condemning the argument and admonishing the jury that it should be disregarded. Personal injury cases have become the most fruitful source of litigation. Many of them are meritorious as tending to make common carriers more careful of human life, and as making some provision for the victim families of the unfortunates; but it must be remembered that the case at bar is not one for punitive damages. The court is satisfied on the record that the derailment in this case was the result of the reckless and dangerous speed of the train of the defendant, in violation of its orders, the fault of the engineer and conductor. In such cases only compensatory damages can be recovered, and the court should see that no jury, however honest and faithful and conscientious and good citizens they may be, shall be allowed by their verdict to disregard the rule stated, ignore the evidence, and fix another rule for the measure of damages unrecognized by the law, and under the circumstances shocking to the mind of the court. In Bolen-Darnell Coal Co. v. Williams, reported in 164 Fed. 666, 90 C. C. A. 482, Philips, Judge, delivering the unanimous opinion for the Court of Appeals for the Eighth Circuit, composed of Sanborn, Hook, and Philips, Judges, this language was used:

"Under the facts and circumstances disclosed by this record, there being neither wantonness nor reckless negligence on the part of the defendant, we cannot refrain from expressing the view that the amount of the verdict awarded by the jury seems to be excessive; so much as to give color to the impression that there was present in the mind of the jury an element of passion or prejudice. The responsibility of correcting such abuse by the jury,

however, rests upon the trial court, to see to it that justice does not miscarry, by presenting to the plaintiff in such instance the alternative of entering a reasonable remittitur or to submit to a new trial."

I am familiar with the record in that case, having examined it in the last day or two. Williams was injured by an explosion in a coal mine in the state of Oklahoma, and recovered a verdict for $12,500. The injury sustained by Williams was of the most serious nature, and involved intense pain and suffering, permanent disability to labor, and his face, neck, and ears were badly burned, a portion of one ear being burned off. The flesh was burned from his hands so that when it sloughed off the bones were in sight. The burns so stiffened his hands and drew his fingers that he could not use them at all, could not do manual labor at all, had not worked a day after his injury. On parts of his hands there was no flesh, only a thin skin. The doctors had advised him that no operation would give him relief. He was confined to his room six weeks. His earning capacity was about $65 per month. His age was 29 years, and his life expectancy about the same as that of Duke. If the Court of Appeals in this class of cases felt called upon to admonish the trial court that this verdict was excessive, what must be said of this case, where all recovery for pain and suffering, past and future, and all temporary and permanent impairment of earning capacity, has been eliminated by instant death? In the Mathis Case the court allowed the widow and five small children as probable contributions the father would have made to their support $4,690, and I think it allowed all the facts warranted; and they allowed on account of care, attention, etc., $3,310, thereby reducing a $10,000 verdict to $8,000. In that case no question was made as to the physical condition of Mathis or his probable life expectancy. He had accumulated a small farm where his family lived, was supervising its cultivation, and contributing nearly as much in addition thereto as the proof justified the jury in finding the plaintiff's intestate in this case was contributing to the support of his family. Mathis' personal and domestic qualities were not the subject of criticism; indeed, they were shown to be laudable. In the case at bar Duke's physical condition and life expectancy were both seriously involved by uncontradicted and I think credible testimony, and which it was in the peculiar knowledge of plaintiff, if it were not true, to combat, which was not done. His physical condition was serious, and his life expectancy grave. If his life was to terminate from disease in a few years at most, as the evidence tended strongly to indicate, then his earning capacity and his care and attention to his children must inevitably have terminated also. This uncertainty of his life makes it more difficult to determine what should be the maximum of his recovery, and leaves the mind of the court to lean towards setting aside the verdict in toto and to grant a new trial. But in the opinion of the court the verdict was for the right party, and the record free from any vital error affecting that right to recover. Naturally, therefore, the court feels that it ought to give the plaintiff the right to elect as to whether she will enter a remittitur, or take the chances of another verdict. Some of the states fix arbitrarily by statute the recovery in such cases at $5,000, and in some it is indefinite, depending on the proof, as it is under the

employer's liability act under which this suit was brought. In the latter class of cases it is left to the sound discretion, good judgment, and varied experience of the jury, subject always to the supervision of the court.

Under all circumstances of this case, after the most careful thought and consideration, I have concluded that I would not have set aside a verdict for $6,000, and, if plaintiff will file a remittitur within two weeks reducing the verdict to the sum mentioned, I will enter judgment therefor; otherwise set aside the verdict, and grant a new trial.